# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

85 FIFTH AVENUE
NEW YORK, NY 10003
TEL 212.257.6800
FAX 212.257.6845
WWW.WIGDORLAW.COM

**Lawrence M. Pearson**
lpearson@wigdorlaw.com

February 23, 2016

**VIA ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

   Re:  <u>Hyun, et al. v. Ippudo USA Holdings, Inc., et al., No. 14-cv-8706(AJN)(FM)</u>

Dear Judge Nathan:

This firm represents Plaintiffs Maria Francisco, John Hyun, Jordan Ricasa, Ryan Robinett and Thanh Ta ("Plaintiffs" or "Named Plaintiffs"), as well as the 48 plaintiffs who have opted into this matter ("Opt-In Plaintiffs") (Plaintiffs and Opt-in Plaintiffs will be jointly referred to herein as the "Collective Members").  We write jointly with Defendants Ippudo USA Holdings, Inc., Ippudo NY, LLC, Ippudo Westside, LLC and Ippudo Kuro-Obi, LLC (together, "Defendants") (Defendants with Collective Members, the "Parties") to respectfully request Your Honor's approval of the attached Settlement Agreement (the "Agreement," attached as Exhibit 1) resolving the claims of the Collective Members, awarding Named Plaintiffs service awards, and awarding our firm the requested and agreed-upon attorneys' fees and reimbursement of litigation costs.  The Parties also respectfully request that the Court schedule a conference at which Plaintiffs and Defendants can answer any questions the Court may have and explain the reasoning and process behind various provisions of the Agreement.

## I.  <u>Introduction</u>

The Parties and their counsel have considered that the interests of all concerned are best served by compromise, settlement and dismissal of all of the claims in this action with prejudice, in exchange for consideration, as set forth in the Agreement.  The Agreement is the result of lengthy arm's-length bargaining between counsel for the Parties, which began after the filing of this action, and continued during the exchange of extensive discovery.  The Agreement reflects a desire by the Parties to fully and finally settle the Collective Members' Fair Labor Standards Act ("FLSA") claims and other claims, as outlined more specifically in the attached Agreement.  A proposed Stipulation and Order of Dismissal is attached to the end of the Agreement.  *See* Ex. 1 (at Ex. A). The Parties respectfully request that the Court retain jurisdiction over any disputes arising out of

# WIGDOR LLP
ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 2

the Agreement during its implementation, which the Parties have proposed in the Agreement and the proposed Stipulation and Order of Dismissal.

## II.     Factual Background

Defendants own and operate three restaurants in New York City named Ippudo East Village, Ippudo Westside, and Ippudo Kuro-Obi (collectively, "Ippudo"), which serve Japanese-inspired food to the public.  The menu focuses on dishes using ramen noodles.  Named Plaintiffs were employed by Ippudo as servers and/or bartenders between May 2013 and June 15, 2015.  The Opt-In Plaintiffs include head servers, servers, bussers, bartenders/barbacks, and counterpersons  at Ippudo.  A list of the Collective Members, along with the location at which each worked, job position/title, employment start date and end date, and the approximate number of weeks worked each year during the period beginning 6 years before the filing of this suit to the end of 2015 (the "Settlement Period") is attached hereto as Exhibit 2.

## III.     Individual Settlement Amounts

The Agreement provides that Defendants agree to pay the Collective Members and their attorneys a maximum total sum of up to Five Hundred Eighty Thousand Dollars and Zero Cents ($580,000.00).  After deducting from the total amount requested for attorneys' fees and service awards to Named Plaintiffs, discussed separately below, Three Hundred and Fifty-One Thousand Eight Hundred and Seventy-Eight Dollars and Seventy-Six Cents ($351,878.76) is to be distributed to the Collective Members as payment to settle their claims against Defendants.  Below is a discussion of the claims in this action, the maximum estimated potential wage recovery, the method used to calculate the individual settlement payments to Collective Members ("Individual Settlement Amounts"), and Defendants' position as to the calculation of the Individual Settlement Amounts.

### A.     Claims Asserted

The Complaint filed in this action (attached hereto as Exhibit 3) alleges that Ippudo violated federal and state labor law because it: (1) improperly applied a tip credit against the minimum wage; (2) failed to compensate employees by rounding time clock entries, not compensating employees for meetings, requiring employees to perform administrative work functions after clocking out, and not compensating employees for the time spent changing in and out of their uniforms; (3) retained a portion of employees' tips (a) to distribute to non-tipped employees, (b) for petty cash and, (c) as payment of credit card fees; (4) made unlawful wage deductions, including through the imposition of various penalties for certain conduct; (5) failed to pay the

# WIGDOR LLP
ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 3

required "Spread of Hours" premium; and (6) failed to pay uniform purchase and maintenance costs.  The estimated potential wage recovery for Collective Members is discussed below.

### B.      Maximum Estimated Potential Wage Recovery for Collective Members

The potential wage recovery for Collective Members was calculated based on the total estimated wage recovery for each claim.  The method by which the estimated recovery for each claim was calculated is described below.

#### 1.      Improper Tip Credit

To estimate the potential wage recovery for the tip credit claim, the reported W-2 wages for each year (which was produced by Defendants during discovery) was divided by the tipped-employee minimum wage to determine the number of hours worked each year.  The total number of hours worked each year was then multiplied by the applicable tip credit for that year.  The amount of tip credit owed for each year was then added together to arrive at the estimated damages for the improper tip credit claim.  *See* Ex. 4.

#### 2.      Uncompensated Time

To estimate the potential wage recovery for allegedly unlawfully rounding time clock entries, allegedly failing to compensate employees for meetings, allegedly requiring employees to perform administrative work functions after clocking out, and allegedly not compensating employees for time spent changing in and out of their uniforms, we reviewed time records, time adjustment records and correspondence produced in discovery, and also conferred with Named Plaintiffs.  The total uncompensated time for Named Plaintiffs was estimated as 11,949 minutes (equivalent to 199.15 hours).  The total uncompensated time estimated for Named Plaintiffs was then divided by the total number of weeks Named Plaintiffs worked during the Settlement Period, to arrive at approximately 30 minutes of uncompensated time per week.  This number was then multiplied by total number of weeks worked by all Collective Members during the Settlement Period to arrive at the estimated total amount of uncompensated time.  *See* Ex. 5.

#### 3.      Tip Retention

To estimate the potential wage recovery for alleged tips withheld or distributed to non-tipped employees, the total amount of W-2 reported tips for Collective Members were collected.  Because documents produced in discovery showed that Defendants retained and/or distributed from 12-16% of pooled tips for "Back" employees who Plaintiffs allege performed non-tipped work and were

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 4

tip-ineligible (which is disputed by Defendants), the total amount of W-2 reported tips were multiplied by 0.14 (14%), which was the average percentage allegedly unlawfully distributed/retained, to arrive at the total estimated amount of tips retained and/or distributed to non-tipped employees.  *See* Ex. 6.[1]

### 4.   "Spread of Hours" Premium

To estimate the potential wage recovery for the "Spread of Hours" premium, the detailed time records produced in discovery were reviewed to search for the total number of days that Named Plaintiffs worked 10 hours or more, and thus were owed "Spread of Hours" pay.  The number of instances found – 289 – was then divided by the total number of weeks Named Plaintiffs worked. This yielded an average of 0.7 shifts per week in which "Spread of Hours" pay was owed.  This average number was multiplied by the total number of weeks Collective Members worked and then was multiplied by the applicable minimum wage to arrive at the estimated amount of "Spread of Hours" premium owed to Collective Members.  *See* Ex. 7.

### 5.   Uniform Maintenance

To estimate the potential wage recovery for uniform maintenance, the number of weeks worked by Named Plaintiffs and Opt-In Plaintiffs in each year was multiplied by the highest applicable rate for uniform maintenance pay (the rate for employees working over 30 hours a week) to arrive at the total estimated uniform maintenance owed.  *See* Ex. 8.[2]

### C.   Method Used  to Calculate Individual Settlement Amounts

To calculate the Individual Settlement Amounts, the total estimated wage recovery for each Collective Member was calculated and then divided by the total estimated wage recovery for all

---

[1]   Evidence obtained through discovery appears to show that Defendants retained the proper amount of tips as reimbursement for credit processing fees, so that claim is not included. Additionally, the amount remaining after distributing tips, the "server tip balance," amounted to only a few dollars per shift for all employees combined, such that any recovery would *de minimis*.

[2]   Based on analysis of the discovery materials produced by Defendants, as well as consultation with certain Collective Members, it appears that Plaintiffs' claim for unlawful wage deductions would not yield any potential damages, as there were no deductions to hourly wages; rather, the complained-of practices instead affected tip-pool percentage distributions.  Therefore, this claim is not included in the damages calculations.

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 5

Collective Members, which allowed Plaintiffs to assign a percentage of the total recovery to each Collective Member.  The percentage of the total was then multiplied by the total net amount of the settlement distributed among Collective Members (*i.e.*, before service awards, attorneys' fees, and reimbursement of costs) to arrive at each Collective Member's Individual Settlement Amount.

      **D.**      **Defendants' Position on the Estimated Damages Owed to Collective Members**

For purposes of settlement, Defendants do not oppose Plaintiffs' methodology in calculating damages.

## IV.      The Agreement Should Be Approved

      **A.**      **Standard of Review**

It should be noted, as a threshold matter, that the Agreement is not a class settlement.  The Agreement was reached on behalf of 53 former and current (of which there were only two) employees of Defendants, all whom have affirmatively joined this case.  Of the 53 individuals, five of them (the Named Plaintiffs) have signed retainers with Wigdor LLP ("Collective Counsel").  The only individuals releasing claims are those who already have or will sign releases in connection with the Agreement, which is of course very different from a class action settlement, in which individuals who are non-signatories to a release becomes parties to that release unless the individuals affirmatively opt-out.[3]

FLSA suits cannot be privately settled, and therefore an action "cannot be dismissed with prejudice until the Court has satisfied itself that the resolution proposed by the parties is 'fair and reasonable.'" *Gaspar v. Personal Touch Moving, Inc.*, 13 Civ. 8187 (AJN), 2015 WL 7871036, at *1 (S.D.N.Y. Dec. 3, 2015) (citing cases).  "A reasonable agreement must 'reflect a reasonable compromise of disputed issues rather than a mere waiver of statutory rights brought about by an employer's overreaching.'" *Id.* (quoting *Mamani v. Licetti*, 13 Civ. 7002 (KMW)(JCF), 2014 WL 2971050, at* 1 (S.D.N.Y. July 2, 2014).

---

[3]      Largely due to concern for absentee class members, courts undertake a detailed review of class action settlements pursuant to the factors set forth in cases such as *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), and *Weinberger v. Kendrick*, 698 F.2d 61, 69 n.10 (2d Cir. 1982) ("In passing on settlements of class actions under F.R.Civ.P. 23 the judge should not regard himself as an umpire in typical adversary litigation.  He sits also as a guardian for class members who have not received a notice or lack the intellectual or financial resources to press objections").

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 6

To determine whether a proposed settlement is fair and reasonable, "a court should consider the totality of circumstances including, but not limited to, the following factors: (1) the plaintiff's range of possible recovery; (2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (3) the seriousness of the litigation risks faced by the parties; (4) whether the settlement agreement is the product of arm's-length bargaining between experienced counsel; and (5) the possibility of fraud or collusion." *Wolinsky v. Scholastic Inc.*, 900 F. Supp. 2d 332, 335-36 (S.D.N.Y. 2012) (citations and quotation marks omitted); *see also Gaspar*, 2015 WL 7871036, at *1. Factors that weigh against approval include: "(1) the presence of other employees situated similarly to the claimant; (2) a likelihood that the claimant's circumstance will recur; (3) a history of FLSA non-compliance by the same employer or others in the same industry or geographic region; and (4) the desirability of a mature record and a pointed determination of the governing factual or legal issue to further the development of the law either in general or in an industry or in a workplace." *Wolinsky*, 900 F. Supp. 2d at 336 (citations and quotation marks omitted).

For the reasons set forth below, the Agreement fully satisfies all the above criteria.

## B.     The Agreement Complies with All Factors

### 1.     Range of Possible Recovery and Seriousness of the Litigation Risks (Factors 1 and 3)

Based upon the above calculations, if the Collective Members had prevailed entirely on all of their claims, which was by no means a guarantee as Defendants had many viable defenses (including, *inter alia*, that tips were not shared with non-service staff and/or that the individuals Plaintiffs claim to be non-service employees were in fact service employees—both of which are fact-intensive inquiries, and form the backbone of the claims for which the overwhelming proportion of potential damages would be sought), Collective Members could have been entitled to a generously estimated $683,446.62 in back wages. We also must consider that Plaintiffs and Opt-In Plaintiffs could be entitled to liquidated damages of 100% on claims over a three-year period under the FLSA and either 25% or 100% in such damages under the New York Labor Law ("NYLL").[4] Of course, these figures assume complete success on all claims, and it is well known that litigation is fraught with risk and uncertainty, to say nothing of delayed recovery or payment. Here, the Agreement provides for recovery of 51.48% of the maximum estimated back wagess. Such a percentage falls well within the range of reasonableness. *See*, *e.g.*, *Beckert v. Ronirubinov*, 15 Civ.

---

[4]     Under the Wage Theft Prevention Act, which took effect on April 9, 2011, liquidated damages under the NYLL increased from 25% to 100%.

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 7

1951 (PAE), 2015 WL 8773460, at *2 (S.D.N.Y. Dec. 14, 2015) (finding that the "amount [the plaintiff] would receive under the Agreement ($29,557.97) is a substantial proportion of the maximum possible recovery he identifies ($114,700)").

The determination of whether a settlement amount is reasonable "does not involve the use of a 'mathematical equation yielding a particularized sum.'" *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005). "Instead, 'there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Id.* "It is well settled that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982). Furthermore, when settlement assures immediate payment of substantial amounts, "even if it means sacrificing 'speculative payment of a hypothetically larger amount years down the road,'" settlement can be reasonable. *See Teachers' Ret. Sys. of Louisiana v. A.C.L.N. Ltd.*, 01 Civ. 11814 (LAP), 2004 WL 2997957, at *5 (S.D.N.Y. May 14, 2004). In light of the unpredictability, the potential defenses that Defendants will assert (only a couple of which are detailed herein), and the range of possible recovery, the proposed settlement of 51.48% of the maximum estimated wages reflects a reasonable compromise over all contested issues.

> **2.    Arm's-Length Bargaining Between Experienced Counsel, Absence of Fraud and Collusion, and the Extent to Which Settlement Will Enable the Parties to Avoid Burdens and Expenses in Establishing Their Respective Claims and Defenses (Factors 2, 4 and 5)**

The proposed settlement is the product of negotiation between the Parties following document productions by both Parties, as well as various exchanges of information. The litigation was aggressively and expeditiously litigated, and all counsel were experienced in wage-and-hour matters, which aided in the elimination of any danger of fraud or collusion. The noteworthy events in the litigation proceeded as follows:

- Plaintiffs commenced this action on October 31, 2014, alleging that Defendants had violated federal and state wage-and-hour laws and regulations.

- After the Parties' discussions concerning resolution reached an impasse, on February 23, 2015, Defendants filed their Answer to the Complaint, denying the allegations.

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 8

- On February 26, 2015, an Initial Pretrial Conference was held and a case management plan and scheduling order was adopted.

- In early March 2015, Plaintiffs served detailed discovery requests on Defendants.

- On May 15, 2015, after Defendants declined to consent to conditional certification of an FLSA collective and the dissemination of collective notice to potential opt-in collective members, Plaintiffs moved for conditional collective certification for the group of employees who worked as "Head Servers," "Servers," "Bussers," "Bartenders," "Barbacks," and any and all other similarly-situated "tipped" employee positions for any length of time during the period of three years prior to the filing of the Complaint until the date of the final disposition of this action (the "FLSA Collective Members").

- On May 28, 2015, Moses & Singer was susbstituted in as counsel for Defendants.  On that same day, a status conference was held before the Court during which Defendants requested, and the Court granted, an extension of their deadline to oppose Plaintiffs' motion for conditional certification to June 8, 2015.

- On June 10, 2015, Defendants notified the Court that Defendants would not oppose Plaintiffs' motion for conditional certification.

- Several days later, the Parties agreed upon the terms and form of the notice to the FLSA collective, and notified the Court.  On June 15, 2015, the Court So-Ordered the proposed Court Authorized Notice of Pendency of Lawsuit and Opt-In Form (the "Notice") to send to the FLSA Collective Members.

- Collective Counsel administered the Notice to the nearly 400 FLSA Collective Members. Additionally, emails and phone calls were made to certain FLSA Collective Members to ensure receipt of the Notice.  In total, 48 FLSA Collective Members opted into this action.

- Collective Counsel aggressively pursued discovery on behalf of the Named Plaintiffs and Opt-In Plaintiffs.  In furtherance of discovery and production of vital information by Defendants, in July 2015, Plaintiffs served a proposed protocol governing the search for and production of electronically stored information (the "ESI Protocol").  The Parties agreed upon the terms of the ESI Protocol on August 20, 2015.

8

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 9

- Collective Counsel sent two letters to Defendants' counsel regarding purported deficiencies in their discovery responses on July 20, 2015 and October 13, 2015, respectively, and made numerous phone calls to Defendants' counsel in pursuit of both general and specific documentation.  Defendants ultimately produced over 13,000 pages of documents in response to two sets of document requests and the ESI Protocol.

- Collective Counsel closely reviewed and analyzed this discovery, and prepared damages calculations and estimates using various models based upon different possibilities apparent in the documents and the Parties' conflicting arguments.

- The Parties noticed a total of 16 depositions.  On the eve of depositions, the Parties escalated their dialogue concerning a possible resolution of the action, prompting the Parties to agree to adjourn the depositions for a reasonable period so long as settlement discussions appeared to be making meaningful progress.

- On December 9, 2015, after extensive, arm's-length settlement negotiations, the Parties notified the Court that the Parties had reached a settlement in principle to resolve the claims of the Collective Members, and were in the process of negotiating the terms of the settlement agreement.

- On December 14, 2015, the Court granted the Parties' request to hold discovery in abeyance pending settlement, and ordered the Parties to submit by January 25, 2016 a settlement agreement and joint letter explaining why the settlement agreement should be approved.

- The Parties held numerous discussions negotiating the terms of the Agreement, including the exchange of multiple drafts of the Agreement, while simultaneously preparing the instant papers for the Court in support of the Agreement.

The above-described litigation and resolution efforts demonstrate the Parties' substantial arm's-length bargaining during the course of a contested litigation process.  The Agreement allows Collective Members to be compensated within a brief period, without incurring further substantial litigation costs or delay, which likely would have involved costly and time-consuming depositions and motion practice, particularly with regard to full class and collective certification, as well as summary judgment, in addition to other expenses associated with trial.  Further, the manner in which this action was aggressively litigated and resolved demonstrates that this settlement is the product of an arm's-length negotiation between experienced wage-and-hour counsel, that there has been no fraud or collusion, and that the settlement represents a fair compromise that enables the

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 10

Parties to avoid the burden, expense and uncertainty of continued litigation in favor of a known result.  These are factors that weigh in favor of finding the settlement fair and reasonable.

> **3.      Presence of Other Employees Similarly-Situated to Plaintiffs and Opt-In Plaintiffs, the Likelihood that Plaintiffs' and Opt-In Plaintiffs' Circumstances Will Recur, and Defendants' History Regarding FLSA Compliance (Counter-Factors 1, 2 and 3)**

The existence of other employees situated similarly to Plaintiffs and Opt-In Plaintiffs should not weigh against the approval of the settlement in this case.  Plaintiffs moved for conditional certification, and the Parties resolved Plaintiffs' motion by agreeing to the same Notice that was approved by the Court, and which was sent to all potential FLSA Collective Members.  Collective Counsel made substantial efforts that went beyond merely mailing out Notices to ensure that putative collective members received notice of their rights to participate in this action.  Approximately 12% (around 1/8th) of the FLSA Collective Members have opted into this action.

There is not a strong likelihood that Collective Members' circumstances will recur, as Defendants are on notice of the nature of the claims that have been brought against them in this action, which is being resolved for a substantial sum of money.  Further, Defendants do not have a history of FLSA non-compliance.  Collective Counsel is unaware of any prior or other current wage-and-hour lawsuits against Defendants, and Defendants have operated restaurants in New York City since 2009.  Significantly, discovery exchanged in this case appears to suggest that Defendants have and are taking certain measures to address some of the allegations brought against them.

> **4.      Desirability of a Mature Record and the Development of the Law (Counter-Factor 4)**

Finally, while the instant case does involve complex issues that have and would require significant litigation to flesh out and resolve, the issues are not particularly novel and do not concern uncharted expanses of wage-and-hour jurisprudence.  Indeed, although Plaintiffs' claims involve factually intensive inquiries, the standards applicable to such legal and factual issues are already well-defined and have been litigated in many other cases.  Therefore, continued litigation would not substantially advance the development of the law.

> **C.      Limited Confidentiality Provision**

The "Limited Confidentiality" Provision included as Paragraph 7 in the Settlement Agreement is narrowly-tailored and does not give rise to any of the concerns Southern District Courts have with

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 11

FLSA confidentiality provisions.  First, this Settlement Agreement will be publicly filed on the Court's electronic filing system, not be subjected to seal or protective order, and be widely accessible to the public-at-large.  *See Lopez v. Nights of Cabiria, LLC*, 96 F. Supp. 3d 170, 178 (S.D.N.Y. 2015). ("One reason for rejecting the confidentiality of FLSA settlements relates to the right of access to 'judicial documents' ... [and] sealing FLSA settlements from public scrutiny could thwart the public's independent interest in assuring that employees' wages are fair.")

Second, the "Limited Confidentiality Provision" is not a provision that "bar[s] plaintiffs from openly discussing their experience litigating this wage and hour case ... [nor does it] run afoul of the purposes of the FLSA and the public's independent interest in assuring that employees' wages are fair."  *Lopez*, 96 F. Supp. 3d at 178 (S.D.N.Y. 2015).  Southern District Courts are wary of confidentiality provisions that "impose an obligation on a settling plaintiff to refrain from discussing any aspect of the case or the settlement."  *Souza v. 65 St. Marks Bistro*, No. 15 Civ. 327 (JLC), 2015 WL 7271747, at *4 (S.D.N.Y. Nov. 6, 2015); *see e.g. Mahalick v. PQ New York Inc.*, No. 14 Civ. 899 (WHP), 2015 WL 3400918, at *2 (S.D.N.Y. Apr. 30, 2015) (admonishing the parties about including a confidentiality provision that prohibits the parties and their attorneys from disclosing the terms of the agreement to anyone other than a spouse, attorney or tax preparer and requires plaintiffs, if asked, to state that "the matter has been settled, resolved, or dismissed"); *see also Kang Ming Sun v. Guang Jun Li*, No. 13 Civ. 8507, 2015 WL 6125710, at *1 (S.D.N.Y. Sept. 15, 2015) (finding that confidentiality provisions "prohibiting the parties from sharing any information about the settlement other than for tax or legal purposes, is contrary to well-established public policy").

In contrast, here the Limited Confidentiality Provision expressly permits all types of discussions about individualized settlement amounts, the background of this litigation, the personal experiences of the litigants relating to this litigation (including any public and private negative remarks, comments, criticisms or rebuke), or any other information about this case.  The Limited Confidentiality Provision expressly permits all types of disclosures with only a limited and narrowly-tailored restriction concerning the Aggregate Settlement Amount.  The parties, along with their respective counsel, are well aware that the Aggregate Settlement Amount encompasses not only damages calculations resulting from compromise for reasons referenced above, but also attorneys fees, costs and service awards.  Defendants believe that the Aggregate Settlement Amount — by itself—creates a false and disproportional sense of culpability and liability without factoring in each category of the settlement monies and the reasons justifying this Aggregate Settlement Amount.  The Parties believe that this Limited Confidentiality Provision in no way poses a chilling effect or serves as a de facto "gag order" to other prospective litigants or to the public at large and that this Limited Confidentiality Provision is not "highly restrictive" or "in strong tension with the remedial purposes of the FLSA."  *See Cheeks v. Freeport Pancake House*,

11

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 12

*Inc., W.P.S.*, 796 F. 3d 199, 206 (2d Cir. 2015) (internal citations omitted). See also *Lopez*, 96 F. Supp. 3d at 174. Finally, and as previously discussed herein, this Court need not be concerned with a "non-disparagement provision" as none exists or was requested, required or considered in this case.  *See Gaspar*, 2015 WL 7871036.

### D.    Service Awards

The Agreement provides for service awards to the Named Plaintiffs in the amount of $6,000.00 each.  "In FLSA collective actions, just as in Rule 23 class actions, service awards are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff." *Diaz v. Scores Holding Co., Inc.*, 07 Civ. 8718 (THK), 2011 WL 6399468, at *3 (S.D.N.Y. July 11, 2011).

In examining the reasonableness of service awards, courts consider: (1) the time and effort expended by the class representatives during the litigation; (2) any burdens sustained by the class representatives, including personal risk; and (3) the ultimate recovery.  *See Frank*, 228 F.R.D. at 181; *see also Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200 (S.D.N.Y. 1987).  Courts recognize the important factual knowledge that class representatives bring to employment class actions, including information about employer policies and practices that affect wages.  *See Frank*, 228 F.R.D. at 187-88 (recognizing the important role that class representatives play as the "primary source of information concerning the claims," including by responding to counsel's questions and reviewing documents).

The Agreement's service awards are reasonable in light of the time and effort that the Named Plaintiffs expended in furtherance of investigation and settlement of the claims in this action.  Each Named Plaintiff was integral in the prosecution of the litigation on behalf of both themselves and others similarly-situated.  Named Plaintiffs rendered services including, but not limited to: (i) participating in the prosecution of this litigation, including reviewing and approving pleadings, (ii) searching for documents relevant to the action, (iii) answering questions pertaining to the claims and defenses, (iv) meeting and communicating with Collective Members at all stages of the litigation, (v) preparing for and actively participating in document review and strategy, including rebutting certain of Defendants' assertions, (vi) undertaking the risk of retaliation, (vii) answering queries from some of their former colleagues regarding the lawsuit, (viii) providing Collective Counsel with corrected or updated contact information of certain putative Class Members, allowing Collective Counsel to ensure that Notice was properly disseminated, (ix) providing affidavits and other information in support of Plaintiffs' motion for conditional certification, and (x) regularly communicating with counsel to remain informed in regard to the notice period and

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 13

settlement approval process.  Without their efforts, this case would not have been brought, and the Settlement would not have reached the level it did or been achieved at all.

Finally, the requested $6,000.00 service awards also are reasonable in light of the settlement amount of $580,000.00.  *See Johnson v. Brennan*, 10 Civ. 4712 (CM), 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011) (approving $10,000 service awards to each of the four named plaintiffs from a $440,000 settlement fund); *Reyes v. Buddha-Bar NYC*, 08 Civ. 02494(DF), 2009 WL 5841177, at *5 (S.D.N.Y. May 28, 2009),  (approving $7,500 service awards to each of the three named plaintiffs from a $710,000 fund);  *Wright v. Stern*, 553 F. Supp. 2d 337, 342 (S.D.N.Y. 2008) (approving $50,000 awards to each of 11 named plaintiffs in $11.8 million employment discrimination settlement); *see also*, *Diaz*,  2011 WL 6399468, at *3 (finding $7,000 service award in wage-and-hour action was reasonable); *Willix v. Healthfirst, Inc.*, No. 07 Civ. 1143 (RER), 2011 WL 754862, at *7 (E.D.N.Y. Feb. 18, 2011) (finding service awards in wage-and-hour action of $30,000, $15,000 and $7,500 to be reasonable); *Mentor v. Imperial Parking Sys., Inc.*, 05 Civ. 7993 (WHP), 2010 WL 5129068, at *1–2 (S.D.N.Y. Dec. 15, 2010) (granting $40,000 and $15,000 service awards in wage-and-hour action); *Duchene v. Michael Cetta, Inc.*, 06 Civ. 4576 (PAC), 2009 WL 5841175 (S.D.N.Y. Sept. 10, 2009) (approving service payments of $25,000 and $10,000 in wage-and hour-action).

Here, the service awards provided for in the Agreement are reasonable given the amount of involvement Named Plaintiffs had in the case and in the ultimate favorable resolution on behalf of themselves and all other Collective Members.

> **E.**   **Attorneys' Fees and Costs**

Collective Counsel respectfully requests that the Court approve the Agreement's provision providing for an attorneys' fees award of $193,333.33 and out-of-pocket expenses in the amount of $4,787.91 (Exs. 9, 10)[5] that Collective Counsel incurred in successfully prosecuting the claims in this action.

---

5       Collective Counsel's time and billing records are redacted for privilege purposes but simultaneous with this filing, un-redacted copies are being hand-delivered to the Court.

# WIGDOR LLP
ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 14

**1.    This Court Should Approve the Agreement's Fees for Collective Counsel**

**a.    The Requested Fees Are Consistent with the Norms in This District**

Collective Counsel is entitled to reasonable attorneys' fees to compensate Collective Counsel for its substantial work identifying, prosecuting, and settling the Collective Members' claims against Defendants.  Collective Counsel's request for thirty-three and one-third percent of the Settlement Fund plus expenses is reasonable and well within the range approved by courts in similar cases. *See, e.g.*, *Raniere v. Citigroup, Inc.*, 11 Civ. 2448 (RWS), 2015 WL 5724669, at *6-8 (S.D.N.Y. Sept. 29, 2015) (awarding 33% of settlement fund of $4.65 million in FLSA/NYLL wage-and-hour action to undersigned Collective Counsel); *Munir v. Sunny's Limousine Service, Inc., et al.*, 13 Civ. 1581 (VSB), Dkt. No. 155 (S.D.N.Y. Jan. 8, 2015) (awarding 33.33% of settlement fund of $3.5 million in FLSA/NYLL wage-and-hour action to undersigned Collective Counsel) (Ex. 11); *Gilliam v. Addicts Rehab. Ctr. Fund*, 05 Civ. 3452 (RLE), 2008 WL 782596, at *5 (S.D.N.Y. Mar. 24, 2008) (fee of one-third of the settlement fund is reasonable and "consistent with the norms of class litigation in this circuit") (citing cases); *Sukhnandan v. Royal Health Care of Long Island LLC*, 12 Civ. 4216 (RLE), 2014 WL 3778173, at *9 (S.D.N.Y. July 31, 2014) (awarding 33% of settlement fund in FLSA and NYLL case and finding 33% "reasonable" and "consistent with the norms of class litigation in this circuit"); *Viafara v. MCIZ Corp.*, 12 Civ. 7452 (RLE), 2014 WL 1777438, at *9, *13 (S.D.N.Y. May 1, 2014) (awarding 33% of settlement fund in FLSA and NYLL case); *Strougo v. Bassini*, 258 F. Supp. 2d 254, 262-63 (S.D.N.Y. 2003) (awarding 33% of $1.5 million class action settlement); *In re Blech Sec. Litig.*,  94 Civ. 7696, 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002) (33 1/3% of settlement fund approved for attorneys' fees, plus costs); *Adair v. Bristol Technology Sys.*, 97 Civ. 5874, 1999 WL 1037878, at *4 (S.D.N.Y.Nov.16, 1999) (33% of settlement fund approved for attorneys' fees, plus costs).

**b.    The *Goldberger* Factors Support the Fees for Collective Counsel**

Reasonableness is the touchstone for determining attorneys' fees.  In *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (internal quotation marks omitted), the Second Circuit articulated six factors for courts to consider in determining the reasonableness of fee applications: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  All of the *Goldberger* factors weigh in favor of granting approval of Collective Counsel's fee application.

14

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 15

### i.  Collective Counsel's Time and Labor

Since Collective Counsel began its investigation and evaluation of the Collective Members' claims, Collective Counsel has expended significant effort to achieve the $580,000.00 settlement with Defendants.  Both prior to and after filing the Complaint, Collective Counsel interviewed the Named Plaintiffs and other service staff at Ippudo about the work that they performed for Defendants, Defendants' compensation and timekeeping practices, including their practices with respect to tip pooling and tip distribution, and other matters relevant to their claims.  Based on these initial interviews, Collective Counsel obtained and reviewed hundreds of pages of documentation, performed a substantial amount of legal research, and determined that Named Plaintiffs appeared to have legally viable claims and that an action should be pursued on their behalf.

This matter has been diligently prosecuted by Collective Counsel at all times.  After this case was filed on October 31, 2014, Collective Counsel and Defendants' former counsel explored the possibility of an early resolution, which, in part, motivated Collective Counsel to consent to permitting Defendants to extend their time to file a responsive pleading until February 23, 2015.  During this time, counsel for the Parties engaged in the exchange of relevant information and documents with an eye towards early resolution.  After it became apparent that the Parties were at an impasse, and after current defense counsel was substituted into this action in early March 2015, Collective Counsel was able to begin to litigate the case diligently and pursue conditional certification and obtaining discovery.

Within weeks of the substitution of Defendants' initial counsel, Collective Counsel raised with defense counsel the issue of whether Defendants would stipulate to FLSA conditional certification and Court-authorized notice, which would obviate the need for motion practice.  Defendants did not agree to this proposal, and on May 15, 2015, Collective Counsel filed a motion for conditional certification of an FLSA collective, supported by a memorandum of law, as well as detailed declarations from Named Plaintiffs.  The Court ultimately granted Plaintiffs' motion as unopposed, and ordered the Parties to meet-and-confer regarding the contents of a proposed notice.

On June 15, 2015, the Parties submitted the Notice, which was so-ordered by the Court later that day.  One week later, on June 22, 2015, Defendants provided Collective Counsel with a class list consisting of over 400 FLSA Collective Members who worked for Defendants' three New York City restaurants during a period from October 31, 2011 forward, in the positions of Head Server, Server, Busser, Bartender and Barback.  The very next day, Collective Counsel mailed the Notice to the approximately 400 putative FLSA Collective Members, who were given 60 days to opt into the action.

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 16

In addition, Collective Counsel spent significant time performing database searches for additional phone numbers and addresses for putative FLSA Collective Members whose mailings had been returned as "undeliverable."  Collective Counsel also contacted putative FLSA Collective Members directly to ensure that the Notice was received.  Due to these diligent efforts, a substantial number of putative FLSA Collective Members were provided with the Notice and an opportunity to opt-in to this action and preserve their FLSA claims.

Furthermore, Collective Counsel also diligently and aggressively sought discovery from Defendants.  Almost immediately after Defendants filed their Answer, Collective Counsel served document requests and interrogatories in early March 2015.  In July 2015, Collective Counsel followed up by serving Defendants with a proposed ESI Protocol.  The ESI Protocol was formally agreed to on August 20, 2015.

In response to Collective Counsel's discovery requests and the ESI Protocol, Defendants produced three batches of documents on June 8, 2015, October 5, 2015, and October 27, 2015, respectively, totaling over 13,000 pages.  Throughout this discovery period, Collective Counsel issued two detailed letters to Defendants concerning purported deficiencies in Defendants' discovery production on July 20, 2015 and October 13, 2015, respectively.  The Parties also exchanged numerous emails with each other, and held countless meet-and-confers to resolve discovery disputes.  As a result of the Parties' disputes concerning discovery, along with what later became meaningful dialogue concerning settlement after sufficient discovery was exchanged, no less than three applications to the Court for extensions of time to complete discovery, on July 14, 2015, August 27, 2015, and November 3, 2015 respectively, were needed.

In addition, Collective Counsel spent a significant amount of time reviewing the thousands of pages of documents produced by Defendants in order to evaluate the strengths and weaknesses of the case, and responsibly discuss a settlement.  Specifically, Defendants provided Collective Counsel with nearly seven years of records, dating back to the opening of Ippudo's East Village location in 2009, which included, *inter alia*:

- Employee personnel files for Collective Members;

- Three different versions of employee handbooks, as well as versions of Defendants' "house rules;"

- Incorporation records for the Defendant entities;

- Employee payroll data for all three Ippudo New York City restaurants;

16

**WIGDOR LLP**

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 17

- Daily "tip sheets" and "tip calculation tables" covering the Settlement Period;

- Wage statements, including W-2 forms, for Collective Members;

- Email communications between Defendants' management employees, both in English and in Japanese;

- Work schedules for all three restaurants from 2009 to 2015; and

- Clock-in/Clock-out data for Collective Members.

This information and data was reviewed and analyzed by Collective Counsel with involvement from Named Plaintiffs. Based on the review and analysis, Collective Counsel determined, *inter alia*: (i) the total number of workweeks that each Collective Member worked for Defendants; (ii) the shortfall in minimum wages owed to each Collective Member during the Settlement Period as a result of Defendants' alleged improper application of the minimum wage tip credit; (iii) the approximate amount of tips allegedly unlawfully distributed to "back of the house" and/or other allegedly tip-ineligible staff during the Settlement Period and owed to each Collective Member; (iv) an estimate, based on time records, time adjustment documents, relevant correspondence between Defendants, and information obtained from Collective Members, of the amount of alleged "off-the-clock" time per week that each Collective Member worked; and (v) the average amount of days per workweek in which a Collective Member worked more than ten hours from the beginning to end of her shift, entitling her to "Spread of Hours" pay, and the corresponding amount of "Spread of Hours" pay owed to Collective Members. These figures enabled Collective Counsel to calculate a reliable estimate, based on substantial data, of damages for all Collective Members.

The determinations made by Collective Counsel required significant time and expense. For example, to calculate the amount of alleged unpaid minimum wages each Collective Member was owed, Collective Counsel: (a) reviewed and logged payroll and wage data provided by Defendants for each Collective Member for each year worked for Defendants during the Settlement Period; (b) determined the applicable minimum wage tip credit rate during relevant time periods; (c) divided the wages earned by each Collective Member by the applicable minimum wage rate (with the tip credit), which allowed Collective Counsel to determine each Collective Member's total hours worked during the relevant time periods; and (d) multiplied that amount by the minimum wage differential (*i.e.*, by the statutory minimum wage rate minus the tip credit rate) to determine the possible minimum wage shortfall per Collective Member.

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 18

Likewise, to calculate the amount of tips/gratuities earned by Collective Members that were allegedly unlawfully distributed to tip-ineligible employees, Collective Counsel: (a) reviewed daily tip logs/sheets to determine how much of the tips collected and pooled was, on average, distributed to "back of the house" staff (determined to be 14% on average); (b) determined what percentage of each Collective Member's earned gratuities was allegedly unlawfully distributed to tip-ineligible employees; and (c) multiplied the amount of tipped wages earned by each Collective Member by the percentage of tips allegedly unlawfully distributed to tip-ineligible employees, to determine the approximate amount of tips that were allegedly unlawfully distributed/retained by Defendants from each Collective Member.

Similarly, to determine "Spread of Hours" damages, Collective Counsel: (a) reviewed personnel files and payroll records to determine total workweeks worked by Named Plaintiffs; (b) reviewed payroll and time records to determine how many times during each workweek, on average, ten hours were worked from the beginning to the end of a shift; and (c) multiplied the total number of workweeks worked by the average amount of days per week worked more than ten hours, and then again by the applicable minimum wage rate, and then extrapolated this amount to reflect collective-wide damages.

Further, to determine "off-the-clock" damages, Collective Counsel: (a) determined the average amount of uncompensated minutes per workweek that Named Plaintiffs worked, which was determined by reviewing time records, time adjustment records, correspondence between managers of Defendants, and information provided by Named Plaintiffs; (b) multiplied that amount by the total number of workweeks worked, and then again by the applicable minimum wage tip credit rate, and then (c) extrapolated this amount to reflect collective-wide damages.

After these damages analyses were run, and on the eve of scheduled depositions which would begin to incur much-increased litigation costs for the Parties, Collective Counsel, in consultation with Plaintiffs, and Defendants' counsel, began to engage in detailed, serious, meaningful and arm's-length settlement discussions. Collective Counsel spent significant time preparing for each of these discussions by reviewing the legal and factual merits of the claims to evaluate the strengths and weaknesses of the case, and preparing rebuttals to assertions made by Defendants' counsel about the merits of Plaintiffs' claims and Defendants' defenses, in order to ensure that they were in a position to responsibly and aggressively discuss settlement. The Parties' substantial, arm's-length negotiations resulted in Plaintiffs' agreement in principle to settle their claims against Defendants, on behalf of themselves and the other Collective Members they agreed to represent, for an aggregate amount of $580,000.00.

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 19

After reaching an agreement in principle, Collective Counsel spent significant time negotiating the terms of the formal Settlement Agreement, and exchanged multiple rounds of revisions with counsel for Defendants.  A very substantial amount of time was spent negotiating various proposed Agreement provisions, about which the Parties had divergent views.  Collective Counsel also spent considerable time drafting and revising a proposed notice of this settlement to Collective Members and a general release, and devising an equitable settlement allocation formula.

In the interim, Collective Counsel has been in regular communication with Collective Members about the status of the settlement, and has fielded many phone calls and emails from other Collective Members with various questions about the matter.

To date, Collective Counsel has expended in excess of <u>469</u> hours of attorney, paralegal and administrative support staff time performing the tasks noted above.  These hours are reasonable for a case like this one, and were compiled from contemporaneous time records maintained by each attorney, paralegal, and support staff member participating in the case.  In addition to the substantial time dedicated to the investigation, prosecution, and resolution of this matter, Collective Counsel will be expending significant additional time and effort to administer the settlement to all 53 Collective Members (*see Khait v. Whirlpool Corp.*, 06 Civ. 6381 (ALC), 2010 WL 2025106, at *9 (E.D.N.Y. Jan. 20, 2010) ("The fact that Collective Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward also supports their fee request."); *Morris v Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 624 (SDNY 2012) (reasoning that the work that Collective Counsel will do after final approval, including assisting with administration and answering class member questions, makes ultimate multiplier less than what it appears at approval stage, and supports fee request)). Therefore, the first *Goldberger* factor supports approval of the Agreement's Collective Counsel Fees.

## ii.    Magnitude and Complexity of the Litigation

This settlement will bring final resolution to the wage claims of 53 individuals.  Under the second *Goldberger* factor, the size and difficulty of the issues in a case are significant factors to be considered in making a fee award.  *See Goldberger*, 209 F.3d at 50; *In re Prudential Sec. Inc. Ltd. P'ship. Litig.*, 912 F. Supp. 97, 100 (S.D.N.Y. 1996).  Here, the size of the class of employees resolving their claims, and the complexity of the factual and legal questions involved further support the reasonableness of the fee award.  *See Johnson*, 2011 WL 4357376, at *17 ("Courts have recognized that wage and hour cases involve complex legal issues."); *Febus v. Guardian First Funding Grp., LLC*, 870 F. Supp. 2d 337, 340 (S.D.N.Y. 2012) ("[C]ourts have recognized that FLSA cases are complex and that '[a]mong FLSA cases, the most complex type is the 'hybrid'

19

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 20

action brought here, where state wage and hour violations are brought as an 'opt out' class action pursuant to [Rule] 23 in the same action as the FLSA 'opt in' collective action . . . .'") (quoting *Johnson*, 2011 WL 4357376, at *17); *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981) ("FLSA claims typically involve complex mixed questions of fact and law"). Further, at all times during the Parties' settlement negotiations, the negotiations were conducted on an arm's-length basis. Collective Counsel reviewed a substantial amount of data to evaluate the Collective Members' claims, as well as to assess Defendants' defenses. The second *Goldberger* factor strongly supports Collective Counsel's attorneys' fees request.

### iii.  Risk of Litigation

The risk of litigation is "perhaps the foremost factor to be considered in determining the award of appropriate attorneys' fees." *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 374 (S.D.N.Y. 2005). Uncertainty that an ultimate recovery will be obtained is highly relevant in determining the reasonableness of an award. *See Grinnell Corp.*, 495 F.2d at 470. "[D]espite the most rigorous and competent of efforts, success is never guaranteed." *Id.* at 471. Collective Counsel prosecuted this action without any assurance of payment for their services, and litigated this case on a wholly contingent basis in the face of substantial risk. Large-scale wage-and-hour cases of this type are, by their very nature, complicated and time-consuming. Any lawyer undertaking the representation of large numbers of affected employees in such actions inevitably must be prepared to make a tremendous investment of time, energy, and resources. Due also to the contingent nature of the customary fee arrangement, lawyers are asked to be prepared to make this investment with the very real possibility of an unsuccessful outcome and the recovery of no fee at all. Collective Counsel stood to gain nothing in the event that the case was unsuccessful or other developments (*e.g.*, Plaintiffs' allegations were unmistakably rebutted by the documentation eventually produced, or Defendants' insolvency or recalcitrance) made recovery impossible.

Indeed, Collective Counsel undertook a substantial risk in pursuing this action given the real concerns that it had with respect to being able to collect against Defendants, a relatively small business affiliated with non-U.S. owners and operators, which also operates in the New York City restaurant industry, a business environment rife with intense competition and thin profit margins. As such, Collective Counsel should be awarded attorneys' fees that recognize the significant assumptions of risk associated with representing employees of relatively modest-sized companies in niche fields, where concerns over collectability are significant. Otherwise, quality attorneys would be deterred from representing employees working for all but the most well-established employers, which would have the unfortunate result of decreasing the likelihood that small employers would be held accountable for wage-and-hour violations.

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 21

Moreover, the circumstances of this case presented numerous hurdles to a successful recovery because of the fact-intensive nature of proving liability under the applicable wage laws, and in light of the defenses available to Defendants, which would pose substantial risk as to both liability and damages. Although Plaintiffs believe that their case is strong, it is arguably defensible on many grounds, and/or would ultimately boil down to a contest over credibility with regard to various factual disputes. Plaintiffs would have to overcome Defendants' defenses, including, but not limited to: (1) that some or all of the employees alleged to be tip-ineligible did, in fact, provide meaningful, direct customer service and/or interact with customers during all or most of the relevant statutory period rendering them tip-eligible, which is supported by, *inter alia*, the purportedly open nature of the kitchen in Defendants' restaurants; (2) that Defendants did not cause Plaintiffs and Collective Members to provide "off-the-clock" work and/or that any "off-the-clock" work was *de minimis*; and (3) that Plaintiffs and Collective Members were not required to wear a uniform within the meaning of applicable law, and their work attire did not require special maintenance. Moreover, Defendants would almost certainly fight class/collective treatment of the Class/FLSA Collective Members' claims on the grounds that they were too individualized to certify as a class and/or collective. Although Plaintiffs believe that they ultimately would establish Defendants' liability, doing so would require significant factual and legal development and overcoming the existence of certain unfavorable documents. Based upon Collective Counsel's experience in such matters, it is reasonable to acknowledge and take into account the reality that the outcome of the trial and inevitable appeals processes are inherently uncertain in terms of outcome and duration.

Despite these risks, Collective Counsel secured a substantial settlement against a small employer in a niche field, which will be paid as soon as August 2016, less than two years after this case was commenced. Accordingly, the third *Goldberger* factor strongly supports Collective Counsel's attorneys' fee request.

### iv.    Quality of Representation

"To determine the quality of the representation, courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Taft v. Ackermans*, 02 Civ. 7951 (PKL), 2007 WL 414493, at *10 (S.D.N.Y. Jan. 31, 2007). In this case, the results speak to the quality of the representation.

The $580,000.00 settlement amount represents a good value given the attendant risks and costs of litigation, even though recovery potentially could be higher if Plaintiffs succeeded on all claims at trial and withstood an appeal. The settlement amount will be available to Collective Members relatively quickly and risk-free, and without the uncertainty, expense and delay of trial.

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 22

Collective Counsel brought its skill and experience to bear and was directly responsible for this favorable settlement, which was achieved in an efficient manner without significant Court intervention at a relatively early stage of litigation, before depositions or extensive motion practice was needed.  The diligent work performed by Collective Counsel in litigating and resolving this matter demonstrates their commitment to the Collective Members and their interests.  Therefore, the fourth *Goldberger* factor strongly supports Collective Counsel's attorneys' fee request.  *See*, *e.g.*, *Velez v Majik Cleaning Serv., Inc.*, 03 Civ. 8698 (KNF), 2007 WL 7232783, at *25 (S.D.N.Y. June 25, 2007) (recommending that "[l]ead Counsel's experience representing plaintiffs in class action" supported a 31% contingency fee award); *Frank*, 228 F.R.D. at 189 (citing plaintiffs' counsel's experience as one factor supporting an attorneys' fee award of 40% of a settlement fund).

### v.      Fee in Relation to the Settlement

Courts also consider the size of the settlement to ensure that the percentage award does not constitute a "windfall."  *See*, *e.g.*, *In re Gilat Satellite Networks, Ltd.*, 02 Civ. 1510, 2007 WL 2743675, at *16 (E.D.N.Y. Sept. 18, 2007).  Courts in this Circuit have routinely granted requests of approximately one-quarter of the fund in cases with settlement funds substantially larger than this one.  *See*, *e.g.*, *Raniere*, 2015 WL 5724669 (approving fee application at level above lodestar rate given Collective Counsel's hourly billing rates of $650 for partner time, $250-$550 for associate time, and $180 for paralegal time); *Munir*, Dkt. No. 155 (Ex. 11) (approving fee application at level above lodestar rate given Collective Counsel's hourly billing rates of $650 for partner time, $275-$475 for associate time, and $180 for paralegal time); *Khait*, 2010 WL 2025106 (awarding 33% of $9.25 million settlement fund in FLSA and multi-state wage-and-hour case). Therefore, the fifth *Goldberger* factor strongly supports Collective Counsel's attorneys' fee request.

### vi.      Public Policy Considerations

Public policy considerations weigh heavily in favor of granting Collective Counsel's requested fees.  In rendering awards of attorneys' fees, "the Second Circuit and courts in this district also have taken into account the social and economic value of class actions, and the need to encourage experienced and able counsel to undertake such litigation."  *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999).

The FLSA and the NYLL are remedial statutes designed to protect the wages of workers.  Fair compensation for attorneys who prosecute those rights by taking on such litigation furthers the remedial purpose of those statutes.  *See*, *e.g.*, *Prasker v. Asia Five Eight, LLC*, 08 Civ. 5811 (MGC), 2010 WL 476009, at *6 (S.D.N.Y. Jan. 6, 2010) ("Attorneys who fill the private attorney

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 23

general role must be adequately compensated for their efforts.  If not, wage and hour abuses would go without remedy because attorneys would be unwilling to take on the risk."); *Goldberger*, 209 F.3d at 51 (commending "sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest.").

Courts have recognized that fee awards in cases like this one serve the dual purposes of encouraging "private attorneys general" to seek redress aggressively for violations (even those of a relatively minor nature when considered on an individual basis) and discourage future misconduct of a similar nature (which is particularly common in certain industries).  *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338-39 (1980).  Class actions also are an invaluable safeguard of public rights.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985); *J.I. Case Co. v. Borak*, 377 U.S. 426, 433-34 (1964).  Courts, therefore, look with favor upon awarding attorney fees in class actions that "encourage the vigilance of private attorneys general to provide corporate therapy protecting the public investor who might otherwise be victimized."  *Grace v. Ludwig*, 484 F.2d 1262, 1267 (2d Cir. 1973).

Courts in this Circuit prefer a "percentage of the fund" method in common fund cases like the instant matter.  *See McDaniel v. County of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this Circuit is toward the percentage method . . . .").  First, the percentage method "directly aligns the interests of the class and its counsel" by  encouraging attorneys to resolve the case efficiently (as was done here) and to create the largest common fund from which payments to the class can be made (also as was done here, as the Collective Members, even after the proposed attorneys' fee and service awards are deducted from the settlement fund, are recovering over 50% of their potential back wages, without accounting for the significant risks attendant to litigation).  *Wal-Mart Stores*, 396 F.3d at 121 (quoting *In re Lloyd's Am. Trust Fund Litig.*, 96 Civ. 1262 (RWS), 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002)); *see also Goldberger*, 209 F.3d at 47-50. The percentage method also is closely aligned with market practices because it "mimics the compensation system actually used by individual clients to compensate their attorneys." *Sumitomo*, 74 F. Supp. 2d at 397; *Strougo*, 258 F. Supp. 2d at 262 (the percentage method "is consistent with and, indeed, is intended to mirror, practice in the private marketplace where contingent fee attorneys typically negotiate percentage fee arrangements with their clients"); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 432 (S.D.N.Y. 2001) (the court should "determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order") (quoting *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992)).

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 24

Second, the percentage of the fund method promotes early resolution.  It "provides a powerful incentive for the efficient prosecution and early resolution of the litigation."  *Wal-Mart Stores*, 396 F.3d at 122 (quoting *Lloyd's*, 2002 WL 31663577, at *25) (internal quotation marks omitted).  The percentage method discourages plaintiffs' lawyers from running up their billable hours and "decreases the incentive to delay settlement because the fee for the plaintiffs' attorneys does not increase with delay."  *Karpus v. Borelli (In re Interpublic Sec. Litig.)*, 03 Civ. 1194 (DLC), 2004 WL 2397190, at *11 (S.D.N.Y. Oct. 26, 2004).  Here, applying only the lodestar method would penalize Collective Counsel for reaching early settlement before a single deposition was taken or any extensive motion practice, and for achieving a quick and manifestly favorable result.  Furthermore, Collective Counsel's work on the matter is continuing throughout the administration of the settlement, which Collective Counsel will conduct on its own rather than engage a claims administrator, which not only significantly increases Collective Counsel's contribution and burden, but also preserves a large portion of the ultimate recovery for Collective Members.  Therefore, the hours expended to date only partly reflect all of the hours Collective Counsel ultimately will devote to the successful and final resolution of this action.

The percentage method also preserves judicial resources, because it "relieves the court of the cumbersome, enervating, and often surrealistic process of evaluating fee petitions."  *Savoie v. Merchs. Bank*, 166 F.3d 456, 461 n.4 (2d Cir. 1999) (internal quotation marks omitted).  The "primary source of dissatisfaction [with the lodestar method] was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits."  *Goldberger*, 209 F.3d at 48-49; *see also In re Ramp Corp. Sec. Litig.*, 05 Civ. 6521 (DLC), 2008 WL 58938, at *2 n.2 (S.D.N.Y. Jan. 3, 2008).

Collective Counsel used a small team of attorneys and staff members at any one time in order to minimize duplication of effort.  Based on the lower end of Collective Counsel's regular hourly rates for attorney and staff time ($650.00-850.00 per hour for partner time; $350.00-500.00 per hour for associate attorney time; and $125.00-180.00 per hour for paralegal/staff time), Collective Counsel's attorneys' fees would have totaled $149,222.50.  These hourly rates are reasonable based on the rates regularly charged for attorney and staff time within this district.  *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (Current "market rates" are proper because such rates more adequately compensate for inflation and loss of use of funds);  *In re Nissan Radiator/Transmission Cooler Litig.*, 10 Civ. 7493 (VB), 2013 WL 4080946 (S.D.N.Y. May 30, 2013) (finding reasonable attorneys' fees based on hourly rates ranging from $750 (partner) to $650 (associate)); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008) (finding reasonable hourly rates ranging from $700 to $750 per hour).

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 25

Even more importantly, these rates constitute Collective Counsel's regular hourly rates for clients paying on an hourly basis, as demonstrated by numerous hourly retainer agreements entered into by Wigdor LLP attorneys over the last three years. Ex. 12. These retainer agreements reflect that partners at our firm, including Collective Counsel, are regularly billed at hourly rates of between $700.00 and $850.00 per hour, and associates at our firm are billed at hourly rates of up to $650.00 per hour. *Id.* Nonetheless, for purposes of calculating our lodestar in this fee application, Collective Counsel has used a rate of $650.00 per hour for Partner Lawrence M. Pearson (despite retainers showing his rate at $700.00-750.00 per hour), $300.00-400.00 per hour for associates based on their seniority,[6] and $125.00 per hour for paralegal time.

---

[6]    Lawrence M. Pearson is a partner at Wigdor LLP. Mr. Pearson received a B.A. in political science, with Honors, from The George Washington University in 1997, and a J.D. from the University of Pennsylvania Law School in 2000. Mr. Pearson is admitted to practice in New York, as well as the Second Circuit Court of Appeals and Eastern and Southern Districts of New York. In addition, Mr. Pearson was recognized by *Super Lawyers* in 2014 and 2015. Since becoming admitted, Mr. Pearson has counseled and represented hundreds of individuals pursuing claims of discrimination, harassment, retaliation, breach of contract, torts, civil rights violations and unpaid compensation and benefits. He also has successfully defended management-side clients from various employment, contract and tort claims.

Tanvir H. Rahman is a senior associate at Wigdor LLP. Mr. Rahman received a B.A. in political science and economics, *summa cum laude*, from Hunter College in 2007, and a J.D. from New York University School of Law in 2010. Mr. Rahman is admitted to practice in New York, as well as the Second Circuit Court of Appeals and Eastern and Southern Districts of New York. Mr. Rahman also is admitted to practice in New Jersey. In addition, Mr. Rahman was recognized by *Super Lawyers* in 2015. Since joining Wigdor LLP in 2011, Mr. Rahman has been involved in nearly one hundred labor and employment matters, including complex wage-and-hour class and collective actions, and large multi-plaintiff discrimination cases. Mr. Rahman has handled matters at all stages of litigation.

Bryan L. Arbeit is an associate at Wigdor LLP. Mr. Arbeit received a B.A. in political science and criminology from the University of Florida in 2008, and a J.D. from Hofstra University School of Law in 2011, graduating first in his class. Mr. Arbeit is admitted to practice in New York and New Jersey, as well as the Second Circuit Court of Appeals and Southern, Eastern and Western Districts of New York and the District of New Jersey. In addition, Mr. Arbeit was recognized by *Super Lawyers* as a Rising Star in 2014 and 2015. Mr. Arbeit's practice includes counseling and litigating in the areas of labor and employment law, civil rights law, appellate practice, and complex class and collective actions, including numerous wage-and-hour matters.

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 26

Wigdor LLP also turns away hourly paying clients on a regular basis, given the firm's case load and commitments to contingency (and various hourly and fee-based) clients.  In addition, for our contingency work, the firm may not necessarily end up recovering attorneys' fees, and also runs the risk of being compensated far below its attorneys' typical billable hourly rates because of the amount of work expended.  Given this construct, any additional risk associated with taking on contingency clients (such as a court not approving a one-third contingency fee) would deter Collective Counsel's firm from representing low-wage employees in certain circumstances (such as Collective Members in this case) who undoubtedly deserve high-quality representation, but who are unable to pay attorneys' regular hourly rates.  Plaintiffs' retainers show that they all agreed to a thirty-three and one-third percent contingency fee representation, which is a rate less than most other types of contingency matters handled by Collective Counsel.  For these reasons, among many others described herein, Collective Counsel believes that their one-third contingency fee is extremely fair and reasonable.

Additionally, Collective Counsel's fee applications using these or higher rates have been approved by courts within this Circuit.  *See*, *e.g.*, Ex. 13 (*Kule-Rubin, et al. v. Bahari Group Limited, et al.*, 11 Civ. 2424 (TPG), Dkt. Nos. 23, 43 (S.D.N.Y. Nov. 15, 2012)) (approving contingency fee based on full hourly rates); Ex. 14 (*Byrne, et al. v. RMJM, Inc., et al.*, 12 Civ. 8203 (AT), Dkt. No. 58, (S.D.N.Y. Oct. 21, 2013)) (in approving payment of attorneys' fees and expenses, the court acknowledged counsel's regular hourly rates of $750 for partner time, $500 for senior associate time, and $300 for other associate time); Ex. 15 (*Adler, et al. v. 20/20 Companies, et al.*, 09 Civ. 439 (LDW)(ARL), Dkt. Nos. 62; 65 (E.D.N.Y. Sept. 7, 2012)) (approving fee application at level above lodestar rate given Collective Counsel's hourly billing rates of $750 for partner time, $300-$600 for associate time, and $180 for paralegal time); *Asare v. Change Grp. of New York, Inc.*, 12 Civ. 3371, 2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013) (approving payment of attorneys' fees and expenses, acknowledging counsel's regular hourly rates of $750 for partner time, $500 for senior associate time, $300 for associate time); Ex. 11 (*Munir*, Dkt. No. 155) (approving fee application at level above lodestar rate given Collective Counsel's hourly billing rates of $650 for partner time, $275-$475 for associate time, and $180 for paralegal time); *Raniere*, 2015 WL 5724669 (approving fee application at level above lodestar rate given Collective Counsel's hourly billing rates of $650 for partner time, $250-$550 for associate time, and $180 for paralegal time).

---

Michelle L. Kornblit was an associate at Wigdor LLP.  Ms. Kornblit received a B.A., *cum laude*, in philosophy and politics from New York University in 2010, and a J.D., *cum laude*, from the Benjamin N. Cardozo School of Law in 2014.  Ms. Kornblit is admitted to practice in New York, New Jersey, and Minnesota.

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 27

When the total hours expended in bringing this matter to a resolution to date are multiplied by Collective Counsel's hourly billable rates, the resulting lodestar figure is $149,222.50. If the Court were to apply a multiplier of approximately 1.29, the Court would arrive approximately at Collective Counsel's current request of $193,333.33. This multiplier is eminently reasonable and compensates Collective Counsel for the substantial risks assumed, the quality of counsel's diligent and aggressive work, the complexity of the work, and the favorable result achieved for the Collective Members. *See Telik*, 576 F. Supp. 2d at 590 ("Courts have continually recognized that, in instances where a lodestar analysis is employed to calculate attorneys' fees or used as a "cross check" for a percentage of recovery analysis, counsel may be entitled to a "multiplier" of their lodestar rate to compensate them for the risk they assumed, the quality of their work and the result achieved for the class.… In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts"); *Johnson*, 2011 WL 4357376, at *20 ("Courts regularly award lodestar multipliers from two to six times lodestar) (citing cases); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 185 (W.D.N.Y. 2011) (multiplier of 5.3). Indeed, applying only the lodestar method would penalize Collective Counsel for reaching early settlement and achieving a quick and manifestly favorable result. As such, the first *Goldberger* factor strongly supports Collective Counsel's fee request.

Typically, courts approve fee applications involving cross-checks with multipliers of 2 to 6 times the lodestar. *See, e.g., Sukhnandan*, 2014 WL 3778173, at *14 (found a multiplier of **2.98** times the lodestar "near the **lower end** of the range of multipliers that courts have allowed") (emphasis added); *Johnson*, 2011 WL 4357376, at *20 ("Courts regularly award lodestar multipliers from **two to six** times lodestar.") (emphasis added); *Davis*, 827 F. Supp. 2d at 184–86 (awarding multiplier of **5.3** in wage-and-hour class action) (emphasis added); *Sewell v. Bovis Lend Lease, Inc.*, 09 Civ. 6548 (RLE), 2012 WL 1320124, at *13 (S.D.N.Y. Apr. 16, 2012) ("**A lodestar multiplier of three falls well within the range** granted by our Courts and equals the one-third percentage being sought.") (emphasis added); *Maley v. Dale Global Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (the "**modest multiplier of 4.65** is fair and reasonable") (emphasis added); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 at 473 (S.D.N.Y. 1998) (approving fees where the multiplier was **3.97** times lodestar) (emphasis added); *Rabin v. Concord Assets Group, Inc.*, 89 Civ. 6130 (LBS), 1991 WL 275757, at *2 (S.D.N.Y. Dec. 19, 1991) (approving fees where the **multiplier was 4.4**) (emphasis added); *In re RJR Nabisco, Inc. Sec. Litig.*, 88 Civ. 7905 (MBM), 1992 WL 210138, at *6-8 (S.D.N.Y. Aug. 24, 1992) (approving fees where the **multiplier was 6**) (emphasis added).

In this case, public policy considerations weigh heavily in favor of awarding Collective Counsel's requested fee. The violations complained of are allegedly of long-standing duration.

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Alison J. Nathan
February 23, 2016
Page 28

Nevertheless, apparently no state or federal governmental action has ever been brought against Defendants to correct these alleged deficiencies. The award of the requested fees will continue to encourage rather than deter the prosecution of similar claims, and advance a significant public interest goal. Therefore, the seventh *Goldberger* factor strongly supports Collective Counsel's attorneys' fee. For all of these reasons, the Court should approve Collective Counsel's attorneys' fees provided in the Agreement.

**2.      Collective Counsel Should Be Reimbursed for Their Reasonable Litigation Expenses**

"It is well settled that attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental and necessary to the representation of those clients." *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 909 F. Supp. 2d 259, 272 (S.D.N.Y. 2012) (citation omitted). Collective Counsel therefore respectfully requests $4,787.91 in reimbursement for expenses incurred during this litigation.

We thank Your Honor for the Court's attention to and consideration of this matter.

Respectfully submitted,

Lawrence M. Pearson

Encs.

cc:      David Feldman, Esq. (*via* ECF)